Before we start the clock, I have a quick question for you, just in terms of the timing. I'm under the impression that you need a decision from our court by a date certain or something like that, and I can't remember what the date is and what the reason for that is. Yes, Your Honor. We had requested an expedited hearing, which we appreciate, because the Forest Service provided a status report to the District Court indicating that it would begin logging in 2019 in late June. I think the date was June 24th or 25th. So we had requested an expedited hearing, and we had also requested, if possible, an expedited ruling. Okay, because there's no stay in effect now? Correct. Okay, I got it. Sorry to sidetrack you with that. If we can start the clock and get your appearance. Well, just if I might follow up. So if there's no stay in effect now, couldn't the Forest Service begin logging? Correct, Your Honor. If I could just introduce myself. My name is Elizabeth Holmes. May it please the Court, I represent Conservation Congress. I'm from Blue River Law. I will also just add this is my first oral argument ever, so I apologize if it's a bit bumpy. There, and I'd also like to reserve five minutes for rebuttal if possible. The Forest Service did begin logging, I believe it was September 4th, 2018, and they have completed to date approximately 66% of the project. Okay. That's what I want to know. I thought that was it. Okay. And the remaining sections are the sections that we have focused on for the preliminary injunction. And the reason that it hasn't gone forward further is because of weather, or do you know? I understand it's weather and other delays that have not been specified. The project is located at high elevation, approximately 4,700 to 6,200 feet, so there's been some bad weather up there this winter. Okay. Thank you for answering my question, just generally. The primary focus of this case is that the Forest Service has selectively chosen approximately 1,300 acres in a 30,000-acre burn to salvage log. The project area is adjacent to the recently delisted Modoc sucker habitat. It's a species that was listed on the Endangered Species Act for 30 years. Can I ask you a question about that? The fact that it was delisted, that really doesn't have any bearing on the case, right? Because the real question is have they complied with NEPA and have they complied with the National Forest Management Act? I believe that the delisting does have some bearing on the case because as part of the delisting, there's a post-delisting monitoring plan that went into effect in 2015, and there are certain things that come out of that, for example, surveys that need to be done every two years. And according to our calculations, there should have been at least one set of surveys that were completed, yet that's not something that the Forest Service evaluated in its decision, and so that goes to the NEPA hard-look angle, certainly. The environmental assessment also states that they will, the Forest Service will consider future surveys of the Modoc sucker to see whether or not the species is still in the area. And so our position is that those surveys and that issue should have been addressed before making the decision. This area also concerns three northern goshawk protected activity centers with mature trees, and as the Forest Service surveys have documented, they still have some green habitat remaining, and enough at least in one of the packs, if not two, to remap them before conducting timber activities in this area. But the Forest Service has said that remapping at this stage could create some danger by going back in there. What's your response to that? So there's two areas that the Forest Service alleges has some danger. One is the roadside salvage logging for trees along there, and that's of some concern because the Forest Service has abandoned the hazard tree guidelines that dictate how to cut trees along the roadside, and they also have not done a road closure order. So we have questions as to whether or not there actually, you know, the degree of danger along those roads. Conservation Congress does not object to roadside logging, certainly for public safety reasons, as long as it's done following these guidelines. Closer to the interior of the project, there's also fire-killed tree guidelines, and it's not been made clear as to whether or not those also have been abandoned by the Forest Service. The reason the hazard tree guidelines were abandoned, according to the Forest Service, is they were determined to be impractical. And so we don't know what that means. We don't know who's making the decision about what trees to be cut on site, if it's the contractor or if it's the Forest Service and what basis is being used to make those determinations. Do you have reason to believe? So your reason to believe that they're not complying with that is because they said they've abandoned those guidelines, but you don't know how that is being done. Is there any reason to believe that the contractors are marking the trees? Yes. I mean, that would be if they are marking the trees, I would assume it's either in conjunction with the Forest Service that are supposed to have a manager on site. The focus of why we're here today is because we're appealing the preliminary injunction order from the Eastern District to California. I was hoping to focus on the merits and the irreparable harm and the equities and public interest prongs of the order. First of all, maybe you could tell me what my standard of review on this order is. It's an abuse of discretion standard, Your Honor. Okay, so if it's an abuse of discretion standard, at that point in time I've got to really suggest that what the district court did in looking at the underlying evidence, that there was no evidence to sustain what the district court did, have I not? I'm sorry, can you repeat your question? Well, if it's an abuse of discretion standard, that suggests that the district court should have absolutely no evidence to sustain what it's doing because the abuse of discretion standard is so low that if there's any evidence to sustain what it's doing, I've got to back it up, I've got to affirm what it did. So I guess I'm trying to figure out if that's my standard, how do I suggest that the balance of equities and the public interest prongs of the preliminary injunction standard that there is just no evidence to sustain what the district court did? Because I looked at it and I said to myself, at least as to a government, when the government is a party, those last two factors kind of merge together. That's out of Drake's Bay Oyster. And I look at the balance of equities and the public's interest in those and I'm trying to see how I can ever suggest there was no evidence to sustain what the district court did here. I think part of that goes to the merits issues because there was obviously— But just a minute, we're talking about likely to succeed on the merits is one of the prongs. And we, I mean, frankly, I think there's good arguments to be made on both of those. I'm not sure that you can say there's no evidence there either because I'm on an abuse of discretion. And I might even say you win on the irreparable harms prong. But you've got to win on all four prongs. So I concentrated on the balance of equities prong and on the public interest prong. And it doesn't seem to me that really you even made too much, if you will, fight about those prongs. You kind of agreed to what the government was suggesting that it is a public interest. The district court said the U.S. Forest Service and the public have a strong interest in taking proactive steps to prevent treacherous road conditions caused by fire-killed trees falling on and obstructing the public roads. They have an interest in mitigating the intensity and severity of the future fires. Your only argument here is that they failed to designate and mark trees for removal. That's the best argument you got. And I'm trying to say, how does that undo the district court's ruling that the balance of equity tips in favor of the Forest Service and the public interest is in favor of the Forest Service? One argument about failure to designate marked trees. Well, I think it also does tie back into some of the arguments that were made with respect to the merits, for example, destroying the reparable harm, destroying the post-fire habitat. The fact that the laws that were being addressed here have not been clarified by the Forest Service is because they say they're following the MODOC Land Resource Management Plan. They also, in their documents, say that they're following and adhering to the Sierra Nevada Forest Plan, but then in argument they say that the Sierra Nevada Forest Plan doesn't apply, but their own integrated design features to support the project pull in part but not completely from the Sierra Nevada Forest Plan. And I think that when a law is not being followed or not being appropriately implemented, then that also can tie into the balance of the equities and the public interest in seeing laws that citizens have the right to enforce like NEPA and the National Forest Management Act upheld. Can I ask along those lines if they're not, admittedly it seems in these salvage sales, there are some specialized regulations that kick into play. It seems like there has to be, and the government's pointed to some of those regulations. If they choose not to follow some of the management plans you're talking about, is that an action, is that a cause of action in and of itself for them not to follow that, or does it get rolled into an APA review claim? I have two ways to kind of address that. The first is that the National Forest Management Act just requires that forest service acts be consistent with the forest plans, and that is actionable under the APA. The other angle of what we're discussing here is that even if the Sierra Nevada Forest Plan doesn't apply because this particular unit, the Big Valley Sustained Yield Unit, is exempt, if it is, the Forest Service proactively and voluntarily created integrated design features for this project that pulled very heavily from the Sierra Nevada Forest Plan. So it essentially adopted certain provisions of it, but only select provisions. So, for example, with the unsuitability determination for the northern goshawk habitat, the Sierra Nevada Forest Plan requires that the unsuitability determination be made, but only if there is no opportunity to remap the packs. And here, the integrated design feature selected to declare the packs unsuitable, but just didn't add in the provision about remapping. So they eliminated certain requirements. So that falls under an arbitrary and capricious argument, and also I think it falls under the hard-look argument because of the effects that that has on the species. If I find that the district court abused its discretion, at that point, do I have to determine if the injunction was narrowly tailored? I don't know which comes first, actually, Your Honor. I think if you find that it abused its discretion and the order— Do you mean the order— Or do I send it back to the district court, and the district court would determine whether the injunction was narrowly tailored to do what it had to be done? I think given the timing and the ability of this court, this court actually could issue the injunction itself. Well, how would I do that on a narrowly tailored— how would I make that determination whether this injunction is narrowly tailored? What we're asking for is in terms of the timing would just be until a decision on the merits is rendered, and at the district court, we've already started our summary judgment. Well, is that enough for a narrow tailoring for me? I believe it is, Your Honor, because the timeframe for which we'd be looking at is probably if we're in mid-May, it would probably just be maybe through the end of the summer. So in terms of timing, it would be narrowly tailored. But isn't that something I've got to discuss if I'm going to make this injunction here? Isn't that something I've got to think about? Yes, and that's why we— How about a bond? For a bond, we argued at the district court, and I believe it's in the appeals briefing too, that in public interest cases like this, there's a long history under NEPA of public interest organizations with very little resources to be exempt from providing a bond. But I'd have to make that determination? Yes, I believe it would be part of any order on the injunction, Your Honor. And not send that to the district court? Why would I make those determinations and not send it to the district court? In the interest of judicial economy and efficiency, I think that would be the most— Well, there's currently a lot more efficiency in economy to have a district court who could have a hearing and get all these witnesses in front of it to determine whether you've got enough money to pay. And secondly, whether this is really narrowly tailored enough for the district court to make that determination than for me to make it. We did file a declaration in the district court from Conservation Congress' executive director specifically addressing the issue of the bond, and the narrow tailor— But nobody ever said anything about it in the district court, right? Because they just denied the injunction? Correct, Your Honor. Correct, yeah. And in terms of geographic scope, we are just asking for this Dutch Flat, Dutch Creek area to be the subject of the injunction, because that's the remaining part of the project that's left. I see I'm into my rebuttal time, if I may. Yes, of course. Let's hear from the government. May it please the Court. Robert Lundman, representing the Forest Service. First thing, just want to talk about the status report quickly. It's ECF docket number 69, the district court. It explains that it's because of the wet soils and the wet weather. The estimate, the best estimate, was work could consume again beginning in late June or early July. That's an estimate. If things dried out more quickly, then the timber contractor would start up more sooner. But the best guess was sometime midsummer. Okay, but as things stand today, that's still the... That's my understanding that things have not started. The report was dated March 26th. I have not heard a further update. There was no indication when I talked to the Forest Service last week that anything had changed. So I don't think work has started yet. And at this point, we have 66% of the project which has been done? 67% of the timber has been cut down. That's split between the two areas, Barber Canyon, which plaintiffs are not as much focused on, versus Dutch Flat Creek. But work has occurred in both, and there's still work to be done in both. And once work resumes, how long until the entire project will be over? That's not clear. I don't think the status report says it has an estimate on that. I think most of it's been done starting about a year ago, and some work stopped in January and February because of the snow. So it's not clear when it will be done. That's the short answer. I want to talk quickly about the balance of equities and public interest. As you know, under winter, if plaintiffs haven't satisfied their burden on any of the four requirements, then no preliminary injunction should issue. It's an extraordinary remedy. And here, the plan, the Forest Service's action is clear. It serves four different purposes, to expedite recovery of the ecosystem, to reduce danger from future wildfires, to remove hazard trees. If the plaintiffs have shown a likelihood of success on the merits, such that cutting down these trees now, at least as things stand today, would be illegal, I guess I don't see what argument you would have for saying that the other factors don't tip in their favor. I think if they had shown a likelihood of success on the merits, they still need to show. Well, you started that. That's why I thought that's where you were going to start. They still need to show irreparable harm, and they still need to show this balance. Right. So these trees will be cut down before any of us can get around to doing anything, and the entire project will be done. And then you say, okay, well, this is basically moot, right? They have to show irreparable harm to them, not to the trees. They have to show that their members, their declarants will be irreparably harmed by cutting down roadside hazard trees and salvage trees. And their declarations don't meet that burden. Even if they did, they still need to show two more things, public interest tips in their favor, and that the balance of equity tips in their favor. And those things do merge in this context. They haven't, on those latter part, they haven't come close to meeting their burden. Their explanation is we don't want this project to happen, but they haven't shown irreparable harm to species that they're concerned about. The record here is no significant impacts on goshawk because the fire burnt down the two protective activity centers essentially completely. And the third one, except for 100 acres, which the forest service is not going to take action in, the green remaining acres. So they just haven't met their burden here of showing that the project going forward is not in the public interest. On the other hand, the record is clear that it has restoration impacts. It has public safety and road safety impacts. And it will reduce fire from future wildfires without any corresponding damage to the goshawk or the Modoc sucker. To me, that just blends the merits inquiry into what you're claiming is the irreparable harm inquiry. If all of that is true, then probably the forest service is right. I think it's all true. And I think you're right that it's all true. And it goes to the merits here, and we went on those as well. If they had identified, and they haven't, a particular forest plan provision that we had not crossed the T and dotted the I on, that doesn't mean that they've satisfied public interest in balance of harms. Those are separate. Winter is very clear on that. And I think we want to be clear on that too. And the district court understood that point. Council, they do. I mean, they would claim a few things, but one is these surveys. Now, My understanding is that the government's position is these surveys are not required. Can you address whether these surveys are required and whether any were done or whether they were exempt under the timeframe? The easiest answer to this is. Surveys were done of this area of the protective activity centers post fire. Their complaint is we didn't do enough surveys and that we should have done remapping for the project went ahead, but the record has, and we've cited two in the brief, the, the three surveys that were done before the decision notice was signed. And those surveys confirmed that there was no, uh, Goss Hawk activity nesting activity in the project area. In fact, at least in one of those, it hadn't been, there hadn't been any nesting activity for several years. If there were six years of surveys that the, the protective activity center that they focus on the Dutch flat Creek activity center had not had any Goss Hawk nesting activity for, I think it was six or seven prior surveys. Is that enough to undermine their standing argument there? Because the only other, as I seemed like they were claiming an interest in the Goss Hawk and then an interest in the, um, in, in the, the fish, the sucker. And, um, as, as to the Goss Hawk, if there weren't any Goss Hawk present for the last five or six years, isn't that enough just to undermine their standing argument? Well, the standing argument and the irreparable harm arguments overlap. Um, this court has held that irreparable harm for preliminary injunction is a higher burden. So that's where we have focused because we feel they fall farther short of that, um, than on the standing issue their declarations focus on or describe interests in the forest generally in the co-fire area. So not just the project area, but the 30,000 acres impacted by the fire and a couple of their declarants talk about the particular project area and how they have visited it and, and, uh, are worried. So they may have standing separate apart from the Goss Hawk. We haven't argued standing. So, so they may have it. I'm not sure what our summary judgment brief will say it's due in a few weeks. Um, here we haven't argued standing. We've argued irreparable harm under the PI standard. Um, okay. The confusion about the, which plan applies isn't really confusion here. The forest service plans are clear, the Modoc plan. So the particular plan for this forest applies. There's also Sierra, Sierra Nevada force plan amendments from 2004. And those answer the question of whether they apply here, because it says they don't apply to the big Valley sustained yield unit. And that's where this project is located. Now the forest service, has in its environmental assessment and decision notice decided to voluntary borrow some aspects of the more modern 2004 Sierra Nevada forest plan. And there's nothing wrong with that. It's saying it has better science in places. And so we're going to use it. Um, and that, and that's what's happened here. And the, and that doesn't make the whole plan bindings, a matter of law just means in this project, the forest services said, we're going to meet this standard. Um, the district court did not rule on this issue. It said, it doesn't really matter because I don't find it's the likelihood of success on the merits under any of the arguments. And the other port point related to this Sierra Nevada forest plan amendment, as our brief explains is the provisions that now show up in plaintiff's opening brief. They did not argue those provisions for this report, and they did not present them to the agency during the NEPA draft process. So they argue on that point that, uh, they didn't, you, you can't waive arguments. You can only waive claims. What's the government's response on that? There there's case law from this court, making that distinction. I think the way you have to look at the distinction and say, well, what is the effect of what they're arguing? And here they're saying in their brief, the government's action is invalid because of this plan provision. And that may not be labeled a claim in their complaint, or it may not be presented in their complaint at all, but that doesn't affect the claim. If you're asking a court to invalidate a government action because of a piece of law in a forest plan, that's not a separate argument. That's not citing a new case or citing a new regulation that bolsters an argument that you're already making. It's a new functional claim. And so that's what, that's why here when you're saying government, you have violated the law because you haven't complied with this provision of the forest plan. You've got to present that to the forest service during the planning process. And you need to present it to the district court during the preliminary injunction process. So what's our standard on waiver then? Whether the government was on notice that these specific provisions had been raised? I think it's whether they fairly, it's with respect to the agency, it's the Department of Transportation public citizen case for the Supreme Court, which is did it put the government on fair notice of what was at stake? And with respect to these specific plan provisions. Well, because if they had put you on notice, you would have addressed, because this goes back to comments that were made to the agency before the record of decision was adopted. Isn't that correct? Right. So if they had put you on notice, you would have addressed it. If they're raising arguments now that are not fairly encompassed or wouldn't have put the government on notice in the, before they made the record of decision, is that our position? Would we then say that those arguments have been waived if the government wasn't on notice prior to the record of decision? Yes,  I think that's the right answer. They haven't, they forfeited them and then we've got the other problem here of that in the preliminary injunction district court briefing, they didn't raise them there either. And there, that's a matter of the court saying, well, we're not, we don't have to consider arguments that weren't presented to the district court unless the court wants to. And there's no good reason here to do so, especially when it's at a preliminary stage and there's merits briefing on summary judgment going on right now that we'll wrap up at the end of July. Let me ask you another question as it relates to irreparable harm. I'm a little worried the district court may have abused its discretion there on irreparable harm as to conservative conservation Congress. And I worry about that because Alliance for the Wild Rockies, reading Alliance for the Wild Rockies, it seems to me that in that case, the members alleged, and I'm only reading what I've got here as notes, that the project to remove fire damaged trees would harm their ability to experience and utilize the areas in their undisturbed state. And the court said that this was an actual and irreparable injury that satisfied the likelihood of irreparable injury requirement articulated in winter. This seems to be on all fours with that. How can the district court suggest they have no irreparable injury? I think the connection that's missing here that the district court relied on is they're connecting the dots between this project area and their recreational and aesthetic interests in it. It's clear that they have a recreational aesthetic interest in the whole area of the fire, which is 30,000 some acres, and in the whole area of the 1.6 million acre forest. What they haven't done is draw that connection between the project area and the harm that it harms them. To be sure, a couple of the declarants, I think Dr. Bevington and possibly Hanson, had mentioned visits to the project area, but that's just in the context of their generalized interest in the whole fire area itself. Denise Boggs especially declares that on previous visits to the project area, she's camped, hiked around, bird watched, and participated in other recreational activities. She declares she has plans to visit the project area in the spring. I think if you read it closely, she's talking about the 30,000 or 24,000 acres of fire damage in the forest that she has visited before. And the point here is that Forest Service's action is about 7% of that larger damaged area. So if you're a plaintiff, a declarant here, not a plaintiff, but a declarant, and you have an interest in that area, that's not enough. You have to explain like, no, no, no, the project is irreparably harming me. So you're suggesting Denise Boggs is for the whole 30,000 rather than this project because I thought she was really talking about the project area. She planned to visit the project area in the spring of 2019, visit the Gosok, Pax, and the Dutch Flat Creek, and that the project would make the forest aesthetically displeasing. So I have visited with members and friends in Northern California, and this is on page ER 472, and we have used and recreated on the MODOC, including in the Cove Fire Project area. So she's visited the forest, and she has also been to the Cove Fire Project area. But I don't think the connection she has drawn is tight enough to establish that the project will irreparably harm her when her interest is more generalized. It's not enough when you're talking about, say, something like a bird that has a larger habitat area than just a confined, whatever you'd want to draw on the map. It's not enough that you have a general interest in that larger area, and you're saying that, hey, if you do this to this one part, it's going to hurt the birds that are going to – that's what I guess I would have assumed would be the response. Yeah, no, I think they haven't said – they haven't explained that they have a particular interest in – the problem with the goshawk specifically, if we're talking about the goshawk, which is, I think, what they have focused on with respect to birds, is that the project here is in two of the goshawk protective activity centers. They're stand-replacing fire. There's no green trees left or very few acres, and the goshawks aren't going to nest there anymore. It might use them for some foraging. It might not, but the Forest Service and ER, starting on page 91, analyzes this for seven or eight pages and concludes, in summary, no significant impact on the goshawk. And so here saying, we like watching the goshawk or trying to find goshawk. They're hard to spot in the wild. One of their declarants has seen one in the wild in the MODOC before. It isn't enough. You have to connect to what the harm is going to be from the project. And here, the Forest Service is going to restore these areas more quickly than if natural regeneration occurs. And they don't take issue with that. They prefer natural regeneration, but they don't have a science that's saying, that's wrong, that's arbitrary and capricious, that's irrational. The Forest Service has explained, and one of the purposes of the project is to lead to natural regeneration more quickly. I think I left a hanging issue about remapping earlier. The remapping standard, which relates to the goshawk, is clear that it may be appropriate, those are the words, to remap after a stand-replacing fire. The Forest Service here has explained, yes, we think remapping is a good idea, just not yet because we want to remap once we know what trees are going to die and what the stands look like. So the Dutch Flat Creek Protective Activity Center, over the next two to five years, the environmental assessment explains, there will be additional tree deaths, and then the Forest Service will be able to decide what makes sense to include in the remapped area. That includes some of the green tree habitat and some habitat outside that activity center. And also it will be safer to do so because the snags that will have fallen will be removed or will have already fallen over. Can I ask a more fundamental question on the irreparable harm? Our case law does suggest that they have an interest in the undisturbed state, but here you're talking about burned land. I mean, do they have the same interest? Sitting inside the goshawk, do they have the same interest in burned forest to have that in an undisturbed state that they would if this were just, you know, if you were doing logging in a forest that truly was undisturbed by nature? I guess that I think in theory one can have that interest. I think you do have to explain when 93% of the fire area will be left in that undisturbed state why your preference, especially with respect to the balance of interest and the public interest, balance of equities and public interest, should outweigh the interest the Forest Service has in treating this 7% area. And that's where I think it's most clearly they have fallen short, that they haven't justified why their interest in natural regeneration and leaving a forest in its burnt state in a slow regeneration process should trump when the vast balance of the area is going to be left in exactly that state. And when we're talking about, especially about a preliminary injunction where you're weighing these equitable factors, I think that is a reason why the PI can be denied and was correctly denied. And I don't think there has to be a further analysis beyond that, but I think the merits also are very clear in our favor as well. Okay. Unless there's any further questions, we ask that you affirm. Great. Thank you very much. You've got some time left for rebuttal. My opposing counsel's last point goes to the first point that we made, is that this is a 30,000-acre fire. There's about 1,300 acres that are being logged. So, yes, my client has an interest in this particular area, but of the 30,000 acres, it's the one that they choose to log. So there's clearly an interest. Your client said that they don't have an interest in the other 93% of the burned area, only in the 7%? No, they have an interest in the whole thing, but opposing counsel was arguing that my client's interest is more in the general fire perimeter and not in the project itself. My clients are very interested in the project area. They're interested in the MODOC itself. Their declarations demonstrate most of them have approximately 20 or 30 years of experience in the MODOC and going through the project area. What's their specific interest in the burned forest itself? Because I don't think they can put in an affidavit that says, we enjoyed going to the burned forest, because they probably haven't been there yet since it's been burned. Actually, they have, and three of them were supposed to go this week, but because of weather delays, they had to push their visits. But part of the interest in the burned forest is that there's a progression of change and development in the forest. Insects come back once the trees start to flush in the springtime. Then bats and birds come back. There's a bird called the black-backed woodpecker, which is prey for the northern goshawk. So there's a very slow chain of events that starts to happen. The government's position is that they're helping your clients out because they're going to expedite the very slow chain of events. It's a different approach. In doing so, the government is doing things like taking out snags, which are part of the habitat that's essential for the black-backed woodpecker.  I do just want to touch on another point that my opposing counsel made with respect to the issue of waiver. We have pages 11 through 17 of our brief address the issue of waiver and whether or not we've waived any of the issues, and our position is that we haven't. I'll just refer to those pages because there's enough citation. Is that your reply brief or your opening brief? That's in the reply brief. I'm sorry. With respect to the surveys, I do just want to point out that in July 14, 2018, there was an unknown raptor sighted in the Dutch Flat Pack. That's the one that has 106 acres left. And in the Dutch Flat Loop Pack, which has approximately 26 acres left, on June 11, 2018, there was an alarm call detected. And then in 2018, the surveys indicated that a northern goshawk was present. And I also just want to highlight that there's different behaviors that the birds have, nesting, obviously, but foraging and hunting. So those are other behaviors that happen in this post-fire habitat. But how much of that disruption, if it has happened, is due to the fire versus what the Forest Service is doing? I mean, that seems to be the complexity that you have here. There is a change that happens, certainly, because of the fire. And the surveys even document the trees that the nests have been in are underburned but not completely burned. There's another tree that a nest was in that was completely burned. But one of our major concerns with this project is that of the remaining green habitat, if the packs are not remapped prior to the Forest Service going in there, then that green habitat risks being cut down. So it's the Forest Service that is causing the harm to plaintiffs and their interest in the packs. I did just want to touch, if I could, on... Do you have any evidence in the room? Go ahead. It's fine. The balance of equities, one of the things that I did just want to add is that regarding the safety issue, like I mentioned, we don't oppose the guidelines, but they were abandoned. And so that's a concern for the equities issue. I know the defendants have mentioned the fuel load and fire prevention. Obviously, it's still important to protect the area and maintain certain management activities for wildfire. But I just want to point out that NEPA and NIFMA and the MODOC Land Resource Management Plan all have provisions for when wildfire happens and when there's catastrophic fires. So that's why it's so important to follow NEPA and NIFMA here is because there's provisions already in those laws to address that the Forest Service has to comply with to undertake actions responding to wildfire. Thank you. Yes, your time has expired. Thank you very much for very helpful arguments in this case. The case just argued is submitted, and we are in recess for today.
judges: N.R. Smith, Watford, R. Nelson